# EXHIBIT 1

Date: **May 23, 2013 MEMORANDUM**

FROM: Blake R. Davis, Assistant Director
Correctional Programs Division

SUBJECT: **Guidance for Home Confinement and Residential Reentry Center Placements**

This memorandum is a compilation of previous guidance memoranda,
Policy, and practices regarding home confinement and Residential Reentry Center (RRC)
placement decisions , as they relate to current policy , practice , and changes which were
necessitated  by the passage of The Second Chance Act of 2007.   The intention of this
memorandum is to reemphasize and clarify established policies and practices to facilitate
effective community placements.

I.        **GUIDING PRINCIPLES FOR EFFECTIVE COMMUNITY PLACEMENTS**

The Bureau's RRC resources continue to be limited and must be focused on those inmates with
the greatest need and the highest risk of recidivism. Program Statement 7310 .04, Community
Corrections Center Utilization and Transfer Procedures, requires that RRC placements based on
assessments of inmate needs for services, public safety, and the necessity of the Bureau to
manage its inmate population responsibly . The Second Chance Act emphasizes the
requirement that all inmates are eligible for pre-release RRC placement    consideration and are
to be assessed on an individual basis.


An individual inmate assessment is the primary means by which we determine an inmate's
need and risk level.     Research indicates that inmates with low needs and a low risk of
recidivating who are placed in an RRC do not benefit from the placement and could become
more likely to recidivate than if they received no placement.

In accordance with the Bureau's mission to ensure public safety, each inmate must be
thoroughly evaluated based upon their need for reentry services, as well as perceived risk for
recidivism and risk to the community. This was previously outlined in the June 24, 2010,
memorandum "Revised Guidance for Residential Reentry Center Placements," and the April 14,
2008, memorandum "Pre-Release Residential Reentry Center Placements following the
Second Chance Act of 2007." When contemplating an inmate's appropriateness for community
placement, staff should continue to follow current policy and practice and consider public
safety while determining an inmate's need for reentry services.     This will help determine
whether or not receiving reentry services might mitigate those public safety concerns in the
long run. For example, some higher risk inmates may initially appear to be inappropriate for
referral to an RRC. However, when you thoroughly weigh the potential for increased risk of
recidivism of a street release versus release through an RRC, it may in fact be in the best
interest of public safety to refer the inmate to the RRC.

Accordingly, every effort should be made to consider community placements for inmates with manageable medical and mental health needs. These placements can help mitigate the potential increased recidivism risk of sending an inmate with these needs directly to the community. A community placement provides more expedient access to resources to address the specialized needs of these populations.  Staff must take the steps necessary to facilitate these placements.

For low need/low risk inmates, home confinement is the preferred pre-release option.   This option is currently under-utilized. Program Statement 7320.01, Horne Confinement, states supervision under home confinement may be provided by contract halfway house services, U.S. Probation or other government agencies.

This is normally accomplished via two home confinement options placement under the supervision of an RRC or placement in the Federal Location Monitoring     (FLM) program operated by U.S. Probation, where available. We must make a concerted effort to utilize these effective community placement options for appropriate inmates.  In addition to reintegrating inmates more quickly into their communities, maximizing the use of home confinement for appropriate inmates will help mitigate our critical population/capacity issues.

Residential Drug Abuse Program (RDAP) graduates who successfully complete the institution-based portion of the RDAP will continue to be assessed for pre-release RRC placements according to the guidance in P7430.02, Community Transitional Drug Abuse Treatment.

Wardens and Residential Reentry Managers (RRMs) play a vital role in ensuring an effective assessment process for inmates' community placements.   This memorandum highlights the major elements of an effective RRC and home confinement utilization strategy.

II.   **MAKING AN APPROPRIATE RRC REFERRAL**

As clarified in the June 2010 memoranda noted above, the Second Chance Act states that while all inmates are statutorily eligible for pre-release community placement, not all will be appropriate.   Inmates must continue to be individually assessed for their appropriateness for and the length of pre-release RRC placements using the following five factors from 18 U.S.C. 3621(b) and outlined in the April 2008 and June 2010 memoranda:

(1)      The resources of the facility contemplated;
(2)      The nature and circumstances of the offense;
(3)      The h story and characteristics of the prisoner;
(4)      Any statement by the court that imposed the sentence:
     (a)      Concerning the purposes for which the sentence to imprisonment was
           determined      to be warranted; or
     (b)      Recommending a type of penal or correctional facility as appropriate, and
(5)       Any pertinent policy statement issued by the U.S. Sentencing Commission.

When reviewing the above factors, staff should continue to consider the inmate's need for reentry services, public safety concerns, and the need to responsibly manage the Bureau's inmate population.

Staff should also continue to thoroughly assess inmates' individual reentry needs when considering the appropriate duration of an RRC placement as outlined in the above referenced memoranda, current policy, and practice. A placement less than 90 days is typically not considered sufficient to address multiple reentry needs. In many cases, a placement of several months up to the maximum of one year may be needed to accomplish an inmate's reentry goals. For example, an inmate with no recent employment, no GED, and poor family ties would benefit more from a one year placement than an inmate who has a short sentence, employment prospects, a high school diploma, and frequent family contacts. The number of placement days should be driven primarily by the inmate's needs and risk level (as determined by the B?-338 Custody Classification assessment or BP-337 Security Designation assessment if a BP-338 has not been completed).

The BP-338 is the Bureau's primary risk prediction instrument. Ordinarily, the lower the BP-338 score, the lower the inmate's risk; conversely, the higher the score, the higher for home confinement placement and those with higher risks should be considered for RRC placement.

It is important to note that in many areas, the Bureau continues to have contracting options available to utilize the more secure environment of a Work Release Center (e.g., county jail/detention center) as a community placement. This may be the most appropriate placement option for inmates who may require closer supervision than an RRC. Institution staff should contact the applicable RRM to determine if this option is available in the area where the inmate is releasing for cases that may be deemed inappropriate for a traditional RRC.

If an inmate is truly not suitable for transfer to an RRC prior to release, staff have the option of contacting the USPO to discuss a possible public law placement wherein the judge places the individual in an RRC after their release from Bureau custody as a condition of supervised release.

III.   **MAKING AN APPROPRIATE REFERRAL FOR DIRECT HOME CONFINEMENT (PRE-RELEASE)**

As outlined in P7320.01, Home Confinement, and per 18 U.S.C.?? 3624(c) (1), all inmates are eligible for home confinement consideration at their six-month or 10 percent date.      When considering an inmate for pre-release community placement, the unit team should pay special attention to reviewing low and minimum security inmates for possible direct placement on home confinement as allowed under P7320.01, Home Confinement. Higher security inmates may be considered if deemed appropriate following an individual assessment. The basic criteria for home confinement includes:

1)      Appropriate release residence (e.g., positive environment free from criminal/drug use activity and a reasonable distance from the RRC, typically less than 100 miles);

2)      No recent major disciplinary issues. This should be based on sound correctional judgment;

3)      Any medical or mental health needs that can be met in the community and funded by the inmate or other documented resources, and

4)      Secured employment is not required for placement on home confinement.

Placement should occur as close to the home confinement eligibility date as possible. The direct home confinement referral is not contingent upon USPO residence approval. A site visit should be requested during the referral process, but should not delay the submission of the referral to the RRM.

As part of their routine duties in processing inmate referrals, RRM staff will determine if placement will be via an RRC contract or FLM. In judicial districts where FLM is available, RRM staff should consider this option for appropriate inmates to the maximum extent possible.

IV.      **RRM STAFF REVIEW OF RRC/HOME CONFINEMENT REFERRALS**

RRM staff will continue to thoroughly review referral documents and other pertinent information for each community placement referral. RRM staff are encouraged to maximize resources to include recommending direct placement on home confinement for appropriate inmates.

The RRM is required to review home confinement eligible inmates in RRCs every two weeks and follow-up with RRC contractors within three working days (of receipt of the biweekly status report) to ensure RRC staff have (as part of the individualized program plan for the inmate) documented an appropriate plan of action with target dates to achieve home confinement placement. This follow-up time frame is a slight reduction from the June 2010 memorandum referenced above which required a weekly review. In locations where RRC bed space is limited, ensuring an inmate's timely placement on home confinement will help address capacity issues and also ensure more inmates are afforded RRC services.   This area will be carefully reviewed for compliance during operational reviews and program reviews.

As previously indicated in the June 2010 memorandum, RRM staff will not unilaterally deny RRC referrals or reduce placement dates unless there are no available RRC beds within a reasonable distance for the specific referral date/length.

## V. COORDINATION BETWEEN INSTITUTION STAFF AND RBM/CTS STAFF

As the subject matter experts for their assigned location, RRM and Community Treatment Services (CTS) staff assist institution staff in making community placements. They provide information regarding available resources and discuss specific cases with institution staff as needed during the referral process and prior to the inmate's transfer to the RRC or placement on direct home confinement. It is important for institution and RRM staff to collaborate with CTS staff to ensure inmates with drug, mental health, or sex offender treatment needs have community based treatment available in the vicinity of the placement.

If RRM staff have concerns regarding a referral and/or the recommended placement, they will communicate these concerns to the referring institution, typically the Case Management Coordinator (CMC).

If the RRM determines a modification to a referral is needed or that other placement options are available (such as direct home confinement for an inmate with low needs/risk or placement in a work release program for a higher security inmate), the change must be approved by the Warden.       The RRM will contact the referring institution's CMC and request the recommended modification be considered. The CMC will facilitate the Warden's review of the request and advise the RRM accordingly. Modifications can occur with the Warden's consent.

Conflicts regarding modifications to referrals should be addressed by institution management staff with the applicable Regional RRM Administrator. (Note: RRM Sector Administrators will assume this responsibility once the nationwide consolidation of RRM is completed. Contact information will be disseminated to institutions accordingly.)

If institution staff determine an inmate is not appropriate for RRC placement, the inmate's release should be carefully coordinated with U.S. Probation or Court Services and Offender Supervision Agency (for DC Code inmates). Such efforts should include the transmission or pertinent mental health and medical information and any other factors that could impact the effective reentry of the inmate to the supervising authority.

## VI.    SUMMARY

Community placements should be driven by the results of an inmate's individual assessment.

RRC placement and length of placement decisions cannot be reduced solely to a classification score or any other type of objective categorization. While staff assessment and analysis of the Custody Classification Form (BP-338) and the ISD Plan are helpful in establishing broad-based groupings, staff must continue to exercise their professional judgment when making individual inmate RRC placement decisions and be prepared to justify those decisions.

When making RRC placement decisions, staff should ensure the BP-338 and ISD Assessment have been completed accurately.

All inmates are eligible for home confinement. Direct placement on home confinement should be considered for low and minimum security inmates. In judicial districts where FLM is available, RRM staff should consider this option for appropriate inmates to the maximum extent possible.

RRMs will continue to be required to review home confinement eligible inmates in RRCs on a regular basis as set forth above. In locations where RRC bed space is limited, ensuring an inmate's timely placement on home confinement will help address capacity issues and also ensure more inmates are afforded RRC services.

Every effort should be made to consider community placements for inmates with manageable medical and mental health needs. A community placement provides more expedient access to resources to address the specialized needs of these populations.     Staff must take the steps necessary to facilitate these placements.

Your assistance in maximizing the RRC/home confinement utilization process is greatly appreciated.

# EXHIBIT 2



Federal Bureau of Prisons

# EXHIBIT 2                    6 pp

Washington. DC 20534

June 24, 2010

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:        D. Scott Dodrill, Assistant Director
             Correctional Programs Division

SUBJECT:     Revised Guidance for Residential Reentry Center
             (RRC) Placements

This memorandum provides guidance to staff when making inmates'
pre-release Residential Reentry Center (RRC) placement decisions.
Assessment and decision-making practices are to focus on RRC
placement as a mechanism to reduce recidivism.  Recidivism
reduction results in cost efficiencies, less victimization, and
safer communities.

Our RRC resources are limited and must be focused on those
inmates most likely to benefit from them in terms of anticipated
recidivism reduction.  In other words, our decisions are to be
based on an assessment of the inmate's risk of recidivism and our
expectation that RRC placement will reduce that risk.  Our
strategy is to focus on inmates who are at higher risk of
recidivating and who have established a record of programming
during incarceration, so that pre-release RRC placements will be
as productive and successful as possible.

As Chief Executive Officers, you play a vital role in
implementing the Bureau of Prisons' (Bureau) reentry strategy,
including RRC utilization.  This guidance will assist you in
making RRC placement decisions.

**GENERAL CONCEPTS** - The following general concepts apply to all
RRC placement assessments and decision-making:

**Eligibility vs. Appropriateness** - When making RRC placement
determinations, it is critical that staff understand the
difference between eligibility and appropriateness.  All inmates
are statutorily eligible for up to 12 months pre-release RRC

-1-

placement. Nevertheless, not all inmates are appropriate for RRC placement, and for those who are appropriate, the length of the RRC placement must be determined on an individual basis in accordance with this guidance.

**Individual Assessments Required** – Inmates must continue to be individually assessed for their appropriateness for and the length of pre-release RRC placements using the following five factors from 18 U.S.C. § 3621(b):

    (1) The resources of the facility contemplated;
    (2) The nature and circumstances of the offense;
    (3) The history and characteristics of the prisoner;
    (4) Any statement by the court that imposed the sentence:
        (a) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
        (b) recommending a type of penal or correctional facility as appropriate; and
    (5) Any pertinent policy statement issued by the U.S. Sentencing Commission.

These individual assessments occur as part of the inmate classification and program review process, with the unit manager holding decision-making responsibility at the unit level. Institution- or region-specific parameters for RRC placement decision-making are prohibited.

**RRC Placements of More Than Six Months** – Regional Director approval of RRC placements longer than six months is no longer required.

**Residential Drug Abuse Program Graduates** – Inmates who successfully complete the institution-based portion of the Residential Drug Abuse Program (RDAP) will continue to be assessed for pre-release RRC placements according to the guidance in the Psychology Treatment Programs policy.

**Coordination Between Institution Staff and Community Corrections Management Staff** – Community Corrections Management (CCM) staff must continue to review referral documents and other pertinent information for every RRC referral. If CCM staff question the appropriateness of the referral or the length of the requested placement, they must communicate these concerns to the referring institution. Differing recommendations will be resolved at the appropriate level within the regional management structure. Under no circumstances should CCM staff unilaterally deny RRC referrals or adjust placement dates, unless these determinations can be linked directly to a lack of RRC bedspace or fiscal resources.

**Medical and Mental Health Concerns** - When considering RRC placement for inmates with significant medical or mental health conditions, institution staff are strongly encouraged to coordinate release planning with CCM staff and Transitional Drug Abuse Treatment staff (for mental health concerns).  If an inmate's condition precludes residential placement in an RRC, and if staff can make appropriate arrangements to secure the community-based medical and/or mental health services these inmates will need, direct placement on home detention should be considered.

**Inmates Who Decline RRC Placement** - If an institution recommends release through a community-based program and the inmate declines, institution staff should counsel the inmate as to the benefits of a structured reentry program.  However, if the inmate continues to decline this opportunity, she/he may do so without being subject to disciplinary action.

**Inmates Who are Inappropriate for RRC Placement** - Inmates who, during incarceration, have refused programming or failed to engage in activities that prepare them for reentry may be inappropriate for RRC placement.  Similarly, inmates with recent, serious, or chronic misconduct and those who have previously failed an RRC program may be inappropriate.

RRCs provide opportunities for inmates to acquire the support systems, e.g., residence, employment, follow-up treatment, they will need to live a crime-free life, but inmates must be ready to take advantage of these opportunities.  If they have clearly demonstrated through their behavior that they are not ready, RRC programming is unlikely to result in behavioral change and would be a waste of the Bureau's resources, as well as place the public at undue risk.

Professional judgment must be exercised, insofar as inmates with some misconduct, or some refusal to participate in programming, may still be appropriate for RRC placement.  Staff must exercise their discretion in determining whether an inmate is ready to take advantage of the opportunities and expanded liberty that RRCs offer.

If staff decide not to refer an inmate for RRC placement, the inmate's release should be carefully coordinated with U.S. Probation or Court Services and Offender Supervision Agency (DC Code inmates).

**Professional Judgment** – RRC placement, in and of itself, is not a reward for good institutional behavior, nor is it an early release program or a substitute for the furlough program. RRC placement and length of placement decisions cannot be reduced solely to a classification score or any other type of arbitrary categorization. While staff assessment and analysis of tools such as the Custody Classification Form (BP-338) and the Inmate Skills Development (ISD) Plan are helpful in establishing broad-based groupings, staff must continue to exercise their professional judgment when making individual inmate RRC placement decisions and be prepared to justify those decisions.

## LENGTH OF RRC PLACEMENT

### General Guidelines

- **Prospective Application** – Inmates with previously established RRC transfer dates will not be reconsidered under this guidance.

- **90 Days Minimum Placement** – With the exception noted below under the heading of Lower-Risk Inmates, inmates should be considered for at least 90 days pre-release RRC placement whenever possible.

- **High-Risk Versus Low-Risk Inmates** – RRCs are most effective, in terms of recidivism reduction, for inmates at higher risk for recidivism. Consequently, appropriate higher-risk inmates should be considered for longer RRC placements than lower-risk inmates. The BP-338 measures some of the factors that predict risk. Ordinarily, the lower the BP-338 score, the lower the risk; conversely, the higher the score, the higher the risk. Therefore, low-, medium-, and high-security inmates tend to be higher risk than minimum-security inmates.

  Similarly, the ISD tool identifies deficits that may contribute to recidivism. Inmates with a significant number of deficits may be at higher risk for recidivism than those with few or no deficits. When making RRC placement decisions, staff should ensure that the BP-338 and ISD Assessment have been accurately completed. While neither tool can be relied upon solely, they are helpful tools in assessing an inmate's risk level.

**Lower-Risk Inmates**

- **Consider Home Detention Option** - With the exception of RDAP graduates, institution staff will evaluate minimum-security inmates who have an approved release residence to determine if direct transfer from an institution to home detention is appropriate. If so, this determination will be noted in item 11 of the Institutional Referral for RRC Placement form, and the requested placement date (item 3.b.) will be the inmate's home detention eligibility date. These procedures are to be followed even if this results in a community-based placement of fewer than 90 days.

- If a minimum-security inmate is not appropriate for direct placement on home detention, staff will request an RRC placement of sufficient length to address the inmate's reentry needs.

- CCM staff are to ensure that procedures are in place for the direct placement of inmates on home detention, or after only a brief stay (14 days or less) in an RRC. At a minimum, CCM staff must monitor their minimum-security population weekly and follow up with RRC contractors to ascertain why eligible minimum-security inmates have not been referred for placement on home detention.

**Higher-Risk Inmates** - As previously stated, in terms of recidivism reduction, inmates at higher risk for recidivism stand to benefit most from RRC services. When considering the length of the RRC placement for higher-risk inmates, staff should consider the following:

- **History of Individual Change** - Assess whether the inmate's history of individual positive change during incarceration indicates an ability and willingness to take advantage of opportunities for positive reintegration to the community. Based on that history, staff must predict whether the inmate is likely to respond positively to the highly structured regimen of an RRC, and whether the inmate will avail her/himself of the available RRC opportunities.

- **History of Program Participation** - Assess the inmate's history of successful completion of, or participation in, available programming opportunities during incarceration, including programming which addresses the deficits identified through the ISD System. In particular, determine whether the inmate completed or made satisfactory progress toward completing a program shown to reduce recidivism, such

—5—

as any of the cognitive/behavioral treatment programs described in the <u>Psychology Treatment Programs</u> Program Statement, as well as academic and vocational training programs.

- **Inmate's Community Support Systems** – Assess the inmate's available community support systems, e.g., housing, employment, etc.

- **Length of RRC Placement** - Longer RRC placements should be considered for inmates whose following factors are high:

  - ➤ Risk for recidivism;
  - ➤ Demonstrated successful participation in or completion of programming opportunities; and
  - ➤ Need to establish community support systems.

Your assistance in implementing these procedures is appreciated. I look forward to working with you as we seek to effectively utilize the Bureau's limited RRC resources.

# EXHIBIT 1A

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 13-39 Erie |
| | ) | |
| BRIAN M. QUIMBY | ) | |
| | ) | |

### MEMORANDUM ORDER

Brian Quimby has filed a *pro se* motion [ECF 69] requesting that the Court recommend to the Bureau of Prisons ("BOP") that he be placed in a Residential Re-Entry Center for a period of twelve (12) months prior to the end of his sentence.

It has always been the policy of this Court not to attempt to order the BOP to do anything, although the Court has often made recommendations to the BOP regarding the placement of defendants. Indeed, on Mr. Quimby's Amended Judgment [ECF 61] we stated: "I recommend assignment to a Center as close to this defendant's home in Sarasota, Fl as possible. He is truly a 'white collar' defendant, and I would not expect him to cause any problems wherever he is assigned. He is well educated, computer experienced and may be helpful to any administration."

Assuming there is no objection from the Government, therefore, I will grant Mr. Quimby's Motion and recommend that he be placed in a Residential Re-Entry Center for a period of twelve (12) months prior to the end of his sentence.

July 13, 2016

Maurice B. Cohill Jr.
Maurice B. Cohill, Jr.
Senior United States District Judge

cc:   Brian Quimby
      #34515-068
      FCI Miami
      PO Box 779800
      Miami, FL 33177

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

United States of America,

        Plaintiff,                              Case No.: 1:07CR00647

        v.                                     **ORDER**

Zubair Ahmed (B.O.P. Inmate 19303-424),

        Defendant,

Defendant pleaded guilty to and was convicted of conspiring to provide material support to terrorists in violation of 18 U.S.C. § 2339A. His base offense level was 43 (deemed 52 for sentencing purposes). Defendant had never been arrested before this offense, but received a criminal history category of IV due to the nature of the crime. This resulted in a Guideline Range of 360 months to life imprisonment.

I sentenced defendant on June 10, 2010, to a term of 120 months, with three years supervised release to follow. The defendant's "out date" is August 17, 2018.

He has filed a *pro se* "Motion Requesting a Judicial Recommendation Concerning Length of RRC/Halfway House Placement." (Doc. 207). The government opposes the motion. (Doc. 208).[1]

For the reasons that follow, I grant the motion and recommend that the Bureau of Prisons *forthwith* arrange for the defendant's release to a halfway house in his hometown, Chicago.

---

[1] The defendant filed his motion on July 10, 2017; the government its response on July 18, 2017. Lest there be any doubt, the delay in deciding the motion was entirely inadvertent, due to my own oversight as to its pendency. The delay was by no means whatsoever intentional. Thus, no reader should infer that my tardiness in preparing and filing this order indicates any hesitancy on my part to grant the defendant's request. I regret my delay in addressing the defendant's motion; the consequences of that delay are, unfortunately, incurable.

1

## Discussion

Title18 U.S.C. § 3624(c)(1) authorizes the Bureau's Director to assign an inmate during the last months of his term (not to exceed twelve months) to a halfway house:

> The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

Halfway house placement is "a mechanism to reduce recidivism." (Doc. 207, Ex. 2 (Bureau of Prisons Director's Memorandum for Chief Executive Officers: "Revised Guidance for Residential Reentry Center (RRC) Placements")). The Second Chance Act instructs that an inmate's placement should be "of sufficient duration to provide the greatest likelihood of successful reintegration in the community." 18 U.S.C. § 3624(c)(6)(C). Although the Director is ultimately responsible for defendant's placement, the Bureau must consider "any statement" I make "recommending a type of penal or correctional facility as appropriate." *See* 18 U.S.C. § 3621(b)(4)(B).

The government's principal contention appears to be that the defendant, in light of the nature of his conviction, deserves no leniency and should not return to his home community until the latest date (usually six months prior to expiration of the term) as of which the Bureau would place him in the halfway house to prepare for release from custody.

I disagree with the government for several reasons.

First: the government says I do not know what the defendant's conduct has been in prison. So saying, the government ignores the courses that defendant has taken on subjects as diverse as Aquiculture and Organic Farming to Computer Applications, Financial Literacy, and Technology 101 to Stress Management and Decision-Making to College Correspondence Courses and Spanish.

2

More to the point, the government offers no evidence as to the defendant's conduct, good or bad, while in custody. But the government certainly could have found out what his record as an inmate was. Its silence in that regard is telling.

Second: with an "out date" one month short of two years before his imposed term ends on July 12, 2020, it is readily apparent that the defendant has substantial good time credit.[2]

That fact, like the government's silence, is telling. Indeed, it suggests that the professed ignorance about the defendant's conduct in prison is not just telling; it appears disingenuous.

Admittedly, the defendant's crime was serious. I took that fact expressly into account at sentencing. I suggest, though, that now is not the time to give, as the government does, too much heed to that factor.

What really matters at this point is assessment of what, if any risk, the defendant poses to the community. Given his apparent rehabilitation, as evidenced by his good time credit and educational pursuits, further imprisonment is simply punitive.

Punishment for punishment's sake is not a § 3553(a) factor.

Nor should or could it be in a penal system in the service of the Rule of Law. Demanding that the defendant remain in prison until the last grain of sand in the hour glass has run down, the government, it seems to me, has no real motivation other than punishment.

To be sure, the government professes concern about community safety. While that is, of course, a core concern, the government offers nothing to substantiate its apprehension.

---

[2] Defendant can earn 42 or 54 days of good time credit per year, depending on the progress he makes toward earning a GED or high school diploma. *See* 28 C.F.R. § 523.20(c). With an "out date" twenty-three months short of the end date of the imposed term, I can infer that defendant may well have earned all the good time credit available to him.

3

The defendant will return to Chicago at some point. Is there any reason to believe that hastening his return by few months (during which he'll still be confined under Bureau control) endangers anyone? The government offers, and I see none.

Instead, I believe that an early start on reentry within the halfway house setting can enhance the likelihood of an uneventful period of supervised release and long-term law-abiding behavior.

When he returns home, defendant will do so tarred with the indelible brush marks of one who wanted to provide substantial assistance to overseas terrorists. That stain will never wash off or be wiped away.

For someone so convicted, reentry will be especially difficult.

That being so, it makes better sense - and better serves the community - to allow the defendant to enter a halfway house now, rather than wait until the usual six months before the end of his term.

Delay, on the other hand, can serve no useful purpose, for the defendant or his community.

## Conclusion

In light of the foregoing, I grant the defendant's motion and recommend that the Bureau of Prisons promptly end his prison confinement and transfer him to a Residential Reentry Center to begin the process of reentry into his home community.

It is, therefore, hereby

ORDERED THAT:

1. The defendant's Motion Requesting a Judicial Recommendation Concerning Length of RRC/Halfway House Placement (Doc. 207), be, and the same hereby is granted;

4

2. The United States Attorney shall on receipt of this Order, immediately forward it to the appropriate Bureau of Prisons officials responsible for deciding when to transfer prison inmates to halfway house custody; and

3. The Clerk shall serve a copy of this Order on the Warden of the Seagoville (Texas) Federal Correctional Institution and the defendant's Case Manager at that institution.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

5

# EXHIBIT 1B



Federal Bureau of Prisons

---

*Washington, DC 20534*

June 24, 2010

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:     D. Scott Dodrill, Assistant Director
          Correctional Programs Division

SUBJECT:  Revised Guidance for Residential Reentry Center
          (RRC) Placements

This memorandum provides guidance to staff when making inmates'
pre-release Residential Reentry Center (RRC) placement decisions.
Assessment and decision-making practices are to focus on RRC
placement as a mechanism to reduce recidivism.  Recidivism
reduction results in cost efficiencies, less victimization, and
safer communities.

Our RRC resources are limited and must be focused on those
inmates most likely to benefit from them in terms of anticipated
recidivism reduction.  In other words, our decisions are to be
based on an assessment of the inmate's risk of recidivism and our
expectation that RRC placement will reduce that risk.  Our
strategy is to focus on inmates who are at higher risk of
recidivating and who have established a record of programming
during incarceration, so that pre-release RRC placements will be
as productive and successful as possible.

As Chief Executive Officers, you play a vital role in
implementing the Bureau of Prisons' (Bureau) reentry strategy,
including RRC utilization.  This guidance will assist you in
making RRC placement decisions.

**GENERAL CONCEPTS** - The following general concepts apply to all
RRC placement assessments and decision-making:

**Eligibility vs. Appropriateness** - When making RRC placement
determinations, it is critical that staff understand the
difference between eligibility and appropriateness.  All inmates
are statutorily eligible for up to 12 months pre-release RRC

-1-

placement.  Nevertheless, not all inmates are appropriate for RRC placement, and for those who are appropriate, the length of the RRC placement must be determined on an individual basis in accordance with this guidance.

**Individual Assessments Required** – Inmates must continue to be individually assessed for their appropriateness for and the length of pre-release RRC placements using the following five factors from 18 U.S.C. § 3621(b):

    (1) The resources of the facility contemplated;
    (2) The nature and circumstances of the offense;
    (3) The history and characteristics of the prisoner;
    (4) Any statement by the court that imposed the sentence:
        (a) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
        (b) recommending a type of penal or correctional facility as appropriate; and
    (5) Any pertinent policy statement issued by the U.S. Sentencing Commission.

These individual assessments occur as part of the inmate classification and program review process, with the unit manager holding decision-making responsibility at the unit level. Institution- or region-specific parameters for RRC placement decision-making are prohibited.

**RRC Placements of More Than Six Months** – Regional Director approval of RRC placements longer than six months is no longer required.

**Residential Drug Abuse Program Graduates** – Inmates who successfully complete the institution-based portion of the Residential Drug Abuse Program (RDAP) will continue to be assessed for pre-release RRC placements according to the guidance in the <u>Psychology Treatment Programs</u> policy.

**Coordination Between Institution Staff and Community Corrections Management Staff** – Community Corrections Management (CCM) staff must continue to review referral documents and other pertinent information for every RRC referral.  If CCM staff question the appropriateness of the referral or the length of the requested placement, they must communicate these concerns to the referring institution.  Differing recommendations will be resolved at the appropriate level within the regional management structure. Under no circumstances should CCM staff unilaterally deny RRC referrals or adjust placement dates, unless these determinations can be linked directly to a lack of RRC bedspace or fiscal resources.

**Medical and Mental Health Concerns** – When considering RRC placement for inmates with significant medical or mental health conditions, institution staff are strongly encouraged to coordinate release planning with CCM staff and Transitional Drug Abuse Treatment staff (for mental health concerns). If an inmate's condition precludes residential placement in an RRC, and if staff can make appropriate arrangements to secure the community-based medical and/or mental health services these inmates will need, direct placement on home detention should be considered.

**Inmates Who Decline RRC Placement** – If an institution recommends release through a community-based program and the inmate declines, institution staff should counsel the inmate as to the benefits of a structured reentry program. However, if the inmate continues to decline this opportunity, she/he may do so without being subject to disciplinary action.

**Inmates Who are Inappropriate for RRC Placement** – Inmates who, during incarceration, have refused programming or failed to engage in activities that prepare them for reentry may be inappropriate for RRC placement. Similarly, inmates with recent, serious, or chronic misconduct and those who have previously failed an RRC program may be inappropriate.

RRCs provide opportunities for inmates to acquire the support systems, e.g., residence, employment, follow-up treatment, they will need to live a crime-free life, but inmates must be ready to take advantage of these opportunities. If they have clearly demonstrated through their behavior that they are not ready, RRC programming is unlikely to result in behavioral change and would be a waste of the Bureau's resources, as well as place the public at undue risk.

Professional judgment must be exercised, insofar as inmates with some misconduct, or some refusal to participate in programming, may still be appropriate for RRC placement. Staff must exercise their discretion in determining whether an inmate is ready to take advantage of the opportunities and expanded liberty that RRCs offer.

If staff decide not to refer an inmate for RRC placement, the inmate's release should be carefully coordinated with U.S. Probation or Court Services and Offender Supervision Agency (DC Code inmates).

–3–

**Professional Judgment** - RRC placement, in and of itself, is not a reward for good institutional behavior, nor is it an early release program or a substitute for the furlough program. RRC placement and length of placement decisions cannot be reduced solely to a classification score or any other type of arbitrary categorization. While staff assessment and analysis of tools such as the Custody Classification Form (BP-338) and the Inmate Skills Development (ISD) Plan are helpful in establishing broad-based groupings, staff must continue to exercise their professional judgment when making individual inmate RRC placement decisions and be prepared to justify those decisions.

## LENGTH OF RRC PLACEMENT

### General Guidelines

- **Prospective Application** - Inmates with previously established RRC transfer dates will not be reconsidered under this guidance.

- **90 Days Minimum Placement** - With the exception noted below under the heading of Lower-Risk Inmates, inmates should be considered for at least 90 days pre-release RRC placement whenever possible.

- **High-Risk Versus Low-Risk Inmates** - RRCs are most effective, in terms of recidivism reduction, for inmates at higher risk for recidivism. Consequently, appropriate higher-risk inmates should be considered for longer RRC placements than lower-risk inmates. The BP-338 measures some of the factors that predict risk. Ordinarily, the lower the BP-338 score, the lower the risk; conversely, the higher the score, the higher the risk. Therefore, low-, medium-, and high-security inmates tend to be higher risk than minimum-security inmates.

  Similarly, the ISD tool identifies deficits that may contribute to recidivism. Inmates with a significant number of deficits may be at higher risk for recidivism than those with few or no deficits. When making RRC placement decisions, staff should ensure that the BP-338 and ISD Assessment have been accurately completed. While neither tool can be relied upon solely, they are helpful tools in assessing an inmate's risk level.

-4-

**Lower-Risk Inmates**

- **Consider Home Detention Option** – With the exception of RDAP graduates, institution staff will evaluate minimum-security inmates who have an approved release residence to determine if direct transfer from an institution to home detention is appropriate. If so, this determination will be noted in item 11 of the Institutional Referral for RRC Placement form, and the requested placement date (item 3.b.) will be the inmate's home detention eligibility date. These procedures are to be followed even if this results in a community-based placement of fewer than 90 days.

- If a minimum-security inmate is not appropriate for direct placement on home detention, staff will request an RRC placement of sufficient length to address the inmate's reentry needs.

- CCM staff are to ensure that procedures are in place for the direct placement of inmates on home detention, or after only a brief stay (14 days or less) in an RRC. At a minimum, CCM staff must monitor their minimum-security population weekly and follow up with RRC contractors to ascertain why eligible minimum-security inmates have not been referred for placement on home detention.

**Higher-Risk Inmates** – As previously stated, in terms of recidivism reduction, inmates at higher risk for recidivism stand to benefit most from RRC services. When considering the length of the RRC placement for higher-risk inmates, staff should consider the following:

- **History of Individual Change** – Assess whether the inmate's history of individual positive change during incarceration indicates an ability and willingness to take advantage of opportunities for positive reintegration to the community. Based on that history, staff must predict whether the inmate is likely to respond positively to the highly structured regimen of an RRC, and whether the inmate will avail her/himself of the available RRC opportunities.

- **History of Program Participation** – Assess the inmate's history of successful completion of, or participation in, available programming opportunities during incarceration, including programming which addresses the deficits identified through the ISD System. In particular, determine whether the inmate completed or made satisfactory progress toward completing a program shown to reduce recidivism, such

–5–

as any of the cognitive/behavioral treatment programs described in the <u>Psychology Treatment Programs</u> Program Statement, as well as academic and vocational training programs.

- **Inmate's Community Support Systems** - Assess the inmate's available community support systems, e.g., housing, employment, etc.

- **Length of RRC Placement** - Longer RRC placements should be considered for inmates whose following factors are high:

  ➤  Risk for recidivism;
  ➤  Demonstrated successful participation in or completion of programming opportunities; and
  ➤  Need to establish community support systems.

Your assistance in implementing these procedures is appreciated. I look forward to working with you as we seek to effectively utilize the Bureau's limited RRC resources.



**FROM:**
Adam Shpyak
C/o Rachel Martin
5350 Valentia St.
Denver, Co 80238

7016 0360 0001 8643 9941

CERTIFIED MAIL

**TO:**
Clerk of Court
Alfred A. Arraj US Courthouse
901 19th Street
Denver, CO 80294

RETURN RECEIPT
REQUESTED

U.S. POSTAGE
DENVER, CO
80264
JUL 26, 18
AMOUNT
$8.46
R2303104253-29
1000
80264